UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

JILLIAN JOHN,

                         Plaintiff,

         v.

KINGSBROOK JEWISH MEDICAL CENTER /
RUTLAND NURSING HOME,

                        Defendant.

------------------------------------------------------------

**MEMORANDUM & ORDER**
11-CV-3624 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Jillian John commenced the above-captioned action, *pro se*, against Defendant

Kingsbrook Jewish Medical Center / Rutland Nursing Home ("Kingsbrook") alleging

discrimination, retaliation and hostile work environment claims based on race and national origin

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII").

Defendant moved for summary judgment on all claims. The Court heard oral argument on

December 5, 2013. The Court granted Defendant's motion for summary judgment with respect

to Plaintiff's discrimination claim based on unlawful termination and Plaintiff's hostile work

environment claim, and granted the parties leave to file additional briefs concerning certain

factual issues. For the reasons stated below, the Court grants Defendant's motion for summary

judgment on all remaining claims.

    **I.**   **Background**

        **a.**   **Employment and Treatment History**

Plaintiff Jillian John was born in Grenada, West Indies and moved to the United States in

1992.  (Pl. Dep. 9:2–9; Def. 56.1 ¶ 4.)[1]  Plaintiff self-identifies as "Black" and

"African-American."  (Pl. Dep. 32:7–9; Def. 56.1 ¶¶ 5–7.)  Plaintiff applied for a certified

nursing assistant ("CNA") position at Rutland Nursing Home ("Rutland") in 1996.  (Def. 56.1

¶ 17.)  Rutland is a nursing home subsidiary of Kingsbrook, a not-for-profit health care

institution located in Brooklyn, New York, that offers acute care, nursing home, and clinical

---

[1]  Plaintiff failed to submit a statement in opposition to Defendant's summary judgment motion pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("56.1 Statement").  Instead, Plaintiff submitted a "Declaration in Opposition" which contains numbered paragraphs and citations to evidence, but is not in accordance with Local Rule 56.1.  Defendant argues that the facts as set forth in its 56.1 Statement should be deemed admitted.  (Def. Reply Mem. 4.)  "Generally, a plaintiff['s] failure to respond or contest the facts set forth by the defendant[] in [its] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed."  *Young v. Nassau Univ. Med. Ctr.*, No. 10-CV-00649, 2011 WL 6748500, at *1 n.2 (E.D.N.Y. Dec. 22, 2011) (internal quotation marks omitted) (quoting *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003)); *see also Bank of America, N.A. v. Fischer*, No. 11-CV-2044, 2013 WL 685614, at *2 (E.D.N.Y. Feb. 25, 2013) (court deemed admitted all material facts set forth in plaintiff's 56.1 Statement where *pro se* defendant failed to submit required response); *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (if the moving party properly notified a pro se litigant of Rule 56 requirements pursuant to Local Rule 56.2, "[p]ro se litigants are then not excused from meeting the requirements of Local Rule 56.1"); Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Liang v. Café Spice SB, Inc.*, No. 09-CV-1306, 2012 WL 5988766, at *1 n.1 (E.D.N.Y. Nov. 29, 2012) (quoting *Holtz*, 258 F.3d at 73).  Because of Plaintiff's *pro se* status and in view of the fact that she has responded to and opposed Defendant's motion in writing and at the oral argument, the Court will review Plaintiff's opposition, deposition and supporting papers for factual disagreements with Defendant's 56.1 Statement.  *Battle v. Day Care Council*, No. 11-CV-4043, 2012 WL 3055574, at *1 n.1 (S.D.N.Y. July 26, 2012) ("Where parties fail to file Rule 56.1 statements of fact, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion for summary judgment, or may alternately 'opt to conduct an assiduous review of the record.'" (citation omitted)).  The Court will only deem admitted those facts in Defendant's Local Rule 56.1 Statement that are supported by admissible evidence in the record.  *See Liang*, 2012 WL 5988766, at * 1 n.1; *Battle*, 2012 WL 3055574, at *1 n.1.

services.  (Def. 56.1 ¶¶ 1, 8.)  Plaintiff worked as a CNA until approximately November 2002 when she began working as a staffing clerk at Rutland.  (*Id.* ¶ 18; Pl. Opp'n Decl. ¶ 8.)

<h3 style="text-align:center">i.    The Kronos Training and Other Workplace Incidents</h3>

Defendant uses three different software programs to manage hours and payroll and keep various employment records.  (Liggins Decl. ¶ 5.)  "Kronos" was used for timekeeping, "Lawson" was used for generating payroll and "Ansos" was used for making staff schedules and for managing and regulating staffing.  (*Id.*)

In November 2007, Plaintiff was asked to attend a training on the Kronos software program ("Kronos Training Incident").  (Def. 56.1 ¶ 66.)  Kronos was used for timekeeping and, ideally, would keep an accurate record of the hours that any employee worked.  (Liggins Decl. ¶¶ 5, 9.)  According to Defendant's records, the others present at the training were Victor Joseph, Juliet Lowers, Helen Thomas and Jackie Edwards.  (*Id.* ¶ 17–18.)  These other employees are all African-American and Joseph, Lowers and Thomas are also Trinidadian.  (*Id.* ¶ 18.)  During the training, Plaintiff complained of being denied full access to Kronos timekeeping software by Christine Kay, Director of Long Term Care at Rutland.  (Def. 56.1 ¶¶ 66–67; Pl. Opp'n Decl. ¶ 5.)  Plaintiff observed that all other trainees were able to do active work on their computers while Plaintiff could only view her computer.  (Pl. Opp'n Decl. ¶ 5, Ex. 2.)  Plaintiff alleges that she interrupted the training to ask why she was the only one not given full access; Kay responded, "because that's what I want you to have."  (Pl. Opp'n Decl. ¶ 4.)  According to Plaintiff, after several moments she asked to be excused, left and immediately informed Genna Moore, then-Director of Nursing, about the incident.  (*Id.*)  Moore later discussed the incident with Earnest Liggins, then-Human Resources Director, and told him that it was "outrageous" to deny Plaintiff full access to Kronos because it was required as part of Plaintiff's job.  (Moore Decl. ¶ 9,

3

annnexed as Ex. 6 to Pl. Opp'n Decl.)  On November 5, 2007, Plaintiff emailed Liggins,

describing the incident and informing him that she felt "humiliated[,] degraded and even

discriminated against" at the hands of Kay based on an "act of segregation."  (Pl. Opp'n Decl.

¶¶ 4–5; Def. Mem. 13.)  According to Defendant, Liggins responded via email and made clear

that "[o]ur sole intention was to provide some individuals with a basic understanding of the

Kronos time and attendance system."  (Hoey Jan. 10, 2014 Decl. Ex. 2.)[2]  Liggins spoke with

Plaintiff over the telephone, informing her that her position did not require full access to Kronos.

(Liggins Decl. ¶ 42.)  Plaintiff did not raise the Kronos issue with Liggins again.  (*Id.* ¶ 43.)

Plaintiff alleges that a few days after she sent Liggins the email, she and her union

delegate went to see John McKeon, Vice President of Human Resources, to complain about

Kay's behavior.  (Def. 56.1 ¶ 67; Compl. 7–8.)  McKeon told her not to worry about her Kronos

access because they were in the process of upgrading Kronos to 6.0 and Plaintiff would be

trained later on the new system.  (Compl. 7.)

In December 2007, Moore was told by Mary Ann Rose, Vice President of Human

Resources, that she would never approve Plaintiff to fill the staffing manager position should it

ever become available.  (Pl. Opp'n Decl. ¶ 5, Ex. 2.)  That same month Plaintiff received

stationery from Rose.  (*Id.* ¶¶ 6–7, Exs. 7–8.)  Plaintiff alleges that this surprised her because

---

[2]  This email was submitted by Defendant in its supplemental brief.  Plaintiff contends that the response was "fabricated" and characterizes its submission as "pathetic."  (Pl. Opp'n Supplemental Mem. 2–3.)  Defendant explains that the email was provided by Liggins who is no longer employed by Kingsbrook, and Defendant would not have been in possession of the email as it does not keep emails over one year old.  (Def. Supp. Reply Mem. 2–6.)  Defendant also submitted an affidavit from the current Director of Internet Technology at Kingsbrook who attests to the fact that the email would not have been saved and that it appears to be a printout of an actual email.  (Declaration of Peter Ribolla dated Mar. 4, 2014.)  In view of the fact that the email was not previously disclosed and Plaintiff's challenge to the authenticity of the email, the Court includes it here to give a complete recitation of the facts as presented by the parties, but the Court will not rely on this email in conducting its analysis.

several times, in prior years, Rose had given Plaintiff a card with a monetary gift for Plaintiff's children.  (*Id.* ¶¶ 6–7; Moore Decl. 7:23–8:3.)

### ii.    Plaintiff's Promotion to Staffing Manager

In or about April 2008, the staffing manager at Rutland, Valerie Bryant, retired after more than twenty years of service.  (Def. 56.1 ¶ 11.)  After Bryant's departure, the human resources department revised the staffing manager position to require a bachelor's degree. (*Id.* ¶ 12.)  The staffing manager position was a salaried, exempt, non-unionized position.  (*Id.* ¶ 29.)  Plaintiff applied for the staffing manager position, (*Id.* ¶ 19; Pl. Opp'n Decl. Ex. 14), and both McKeon and Rose approved Plaintiff's promotion, (Def. 56.1 ¶¶ 15, 21).  Plaintiff was promoted to staffing manager in May 2008, (*id.* ¶ 20), despite not having a bachelor's degree, (Pl. Dep. 97:11–15).  Plaintiff's promotion included a six month probationary period.  (Pl. Opp'n Decl. Ex. 17.)

As staffing manager, Plaintiff was responsible for creating new employee schedules, monitoring absenteeism and lateness, and ensuring adequate staffing coverage for Rutland at all times.  (Def. 56.1 ¶ 24.)  In addition, Plaintiff scheduled extra shifts, including overtime shifts, for CNAs at Rutland.  (Pl. Dep. 70:5–72:22.)  The parties agree that CNAs typically work part-time and depend on extra shifts to earn additional income.  (*Id.* at 84:6–24; McKeon Decl. ¶ 19.)  Plaintiff also had a role in assigning CNAs to work in different units.  (Pl. Dep. 242:24–243:24; Edouard Decl. ¶ 11; McKeon Decl. ¶ 20.)  According to Plaintiff, all CNAs were trained to work in all units.  (Pl. Opp'n Decl. ¶ 25.)  However, Defendants argue that some units were more desirable than others.  (Edouard Decl. ¶ 12; McKeon Decl. ¶ 21.)

Following her promotion, Plaintiff alleges that Kay began to harass Plaintiff by issuing bi-weekly reports highlighting Plaintiff's payroll errors.  (Pl. Opp'n Decl. Ex. 18; Pl.

Dep. 332:1–333:3.)  In addition, Plaintiff continued to have only limited access to Kronos, a program which Plaintiff alleges she needed to access on a daily basis as a staffing manager.  (Pl. Opp'n Decl. Ex. 56.)  According to Defendant, Plaintiff — as a staffing clerk and as staffing manager — did not have timekeeping responsibilities and, therefore, never needed access to Kronos.  (Liggins Decl. ¶¶ 21–22.)

In September 2008, an email exchange prompted by Kay and which included Moore, Liggins, Rose and Plaintiff, took place regarding Plaintiff's desire to schedule compensation time for herself given the extra hours she had been working.  (Pl. Opp'n Decl. ¶ 21, Ex. 19.)  Plaintiff was informed that any compensation time must be scheduled within the same pay period as the additional hours worked.  (*Id.*)  Plaintiff also alleges that all exempt and non-union employees are given the opportunity to be compensated for all their extra hours worked through an internal agency called At the Moment, ("ATM").  (Pl. Opp'n Decl. ¶ 26.)  According to Plaintiff, when she requested access to ATM from Rose, Rose stated that she was not comfortable with "Plaintiff working through [ATM] for fear of theft."  (*Id.*)  Plaintiff also alleges that she spoke with McKeon about compensation; McKeon agreed that compensation through ATM "would be the ideal thing to do," but he failed to follow through.  (*Id.*)  McKeon declares that he told Plaintiff that as an exempt worker, she was not entitled to compensation for overtime, (McKeon Decl. ¶ 26), and, in any event, Plaintiff was not eligible for ATM, (*id.* ¶ 28).

On October 2, 2008, Plaintiff submitted a written complaint to the human resources department concerning various incidents involving her managers at Rutland.  (Def. 56.1 ¶ 69; Pl. Opp'n Decl. ¶ 28, Ex. 28.)  In the letter addressed to McKeon, Plaintiff identifies the Kronos Training Incident, the error reports generated by Kay, the degree requirement added to the staffing manager position and the extra hours worked without compensation of any kind.  (Pl.

Opp'n Decl. Ex. 24.)  Plaintiff expressly stated that she believed the enumerated incidents were in violation of Title VII.  (*Id.*)

### b.    Defendant's Investigation into Plaintiff's "Su-Su"

In or about August 2009, the human resources department received complaints that Plaintiff was running a savings collective, known as a "su-su," involving Kingsbrook employees. (Def. 56.1 ¶ 31.)  A "su-su" involves the pooling of money from different individuals, which pool of money is then paid out on a weekly or bi-weekly basis to one of the individuals involved until each person receives their "hand."  (*Id.* ¶ 32; Pl. Dep. 38:2–20.)  According to Plaintiff, the practice is traditionally West Indian.  (Pl. Dep. 38:2–5; Pl. Opp'n Mem. 11.)  Plaintiff ran a "su-su" in August of 2009.  (Pl. Dep. 39:20–22.)  Plaintiff cannot recall how many "su-su" collections she ran during her employment with Defendant — more than one and "probably" more than ten.  (*Id.* at 40:19–24; 43:2–5.)  Plaintiff's "su-su" involved Kingsbrook employees, some of whom she could schedule for overtime.  (Pl. Dep. 70:6–20, 212:14–19, 478:22–479:1.)

According to Defendant, it received complaints that Plaintiff would assign shifts based on participation in her "su-su" and began an investigation as a result of the complaints.  (Def. 56.1 ¶ 34; McKeon Decl. ¶¶ 32–33.)  Defendant provides evidence of only two complaints.  One is anonymous and bears a stamp indicating it was received on August 19, 2009, sixteen days after Plaintiff's suspension.  (McKeon Decl. ¶ 32, Ex. 5.)  The other identified complaint was made "sometime in the middle of 2009" by Candace Browne, then-Benefits Coordinator at Kingsbrook, to McKeon, after a conversation Browne had with another Rutland employee who informed Browne of Plaintiff's "su-su."  (Browne Decl. ¶¶ 4–5.)  Effective August 3, 2009, Plaintiff was suspended with pay pending the outcome of Kingsbrook's investigation into her "su-su."  (Def. 56.1 ¶ 35.)  McKeon interviewed several Rutland employees who confirmed

seeing Plaintiff collect and distribute money during working hours. (*Id.* ¶ 36.) Plaintiff alleges that no employee interviews took place while she was on suspension, (Pl. Decl. ¶ 34), but instead were all conducted subsequent to Plaintiff's termination, (*id.*).

On August 12, 2009, McKeon interviewed Plaintiff regarding the "su-su." (Def. 56.1 ¶ 39.) According to Defendant, Plaintiff admitted to running a "su-su" during work hours on Kingsbrook's premises involving employees, including CNAs working at Rutland. (*Id.* ¶ 40.) Plaintiff told McKeon that management was aware of her "su-su" and that such activity was "rampant" at Kingsbrook. (*Id.* ¶ 42.) According to Plaintiff, she never admitted that the "su-su" collection occurred on Kingsbrook property. (Pl. Opp'n Decl. ¶ 36; Pl. Dep. 210:15–17.) Plaintiff also denies discussing management's awareness of her "su-su".[3] (Pl. Opp'n Decl. ¶ 37.) McKeon informed Plaintiff that such conduct was a violation of Kingsbrook Conflict of Interest and "Non-solicitation policies." (Def. 56.1 ¶ 43.) On August 14, 2009, Defendant received notes from two different Kingsbrook employees admitting to their participation in Plaintiff's "su-su." (Pl. Opp'n Decl. ¶ 32, Exs. 30–31.)

According to Defendant, McKeon and Rose subsequently decided to terminate Plaintiff's employment based on Plaintiff's admission. (Def. 56.1 ¶ 45.) Plaintiff's termination was effective September 11, 2009. (*Id.* ¶ 47.) Plaintiff alleges that she was constructively terminated by Kay on August 3, 2009, the date of her suspension. (Pl. Opp'n Decl. Ex. 28.)

---

[3] After Plaintiff's termination, Kingsbrook hired an outside attorney, Nancy Schess, to investigate Plaintiff's allegations of managerial awareness and "rampant" "su-su" activity. (Def. 56.1 ¶ 51.) Schess concluded that management was unaware of Plaintiff's "su-su." (*Id.* ¶ 53.) However, Schess did find that Janet Hunt, a CNA, also ran a "su-su." (*Id.*) Hunt was subsequently terminated. (*Id.* ¶¶ 49.)

### i. Kingsbrook's Offer to Reinstate Plaintiff

Prior to her promotion to staffing manager, Plaintiff was a member of 1199/SEIU, Health Care Workers East. (Def. 56.1 ¶ 55.) At the time of Plaintiff's termination, Lytton Perez was employed by the Union as a Union Organizer at Kingsbrook, (*Id.* ¶ 56), and Greg Williams was employed by the Union as a Labor Relations Manager at Kingsbrook, (*Id.* ¶ 58). In September 2009, shortly after Plaintiff's employment was terminated, McKeon discussed with Perez and Williams reinstating Plaintiff to a CNA or Patient Care Technician ("PCT") position, both of which are unionized positions. (*Id.* ¶ 60.) Williams informed McKeon that Plaintiff only wished to be reinstated to the staffing manager position. (*Id.* ¶ 64.) Plaintiff alleges that she never received an offer of reinstatement. (Pl. Opp'n Decl. ¶ 43.) The staffing manager position has since been eliminated.[4] (Def. Reply Mem. 17; Rose Dep. 35:3–11; Kay Dep. 38:20–39:7.)

On August 19, 2009, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") regarding Defendant's alleged discriminatory conduct. (Pl. Opp'n Decl. Ex. 52.) The EEOC issued a right to sue letter on April 27, 2011. (Compl. ¶ 32.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic*

---

[4] Plaintiff alleges that the Staffing Manager position was advertised subsequent to her termination, on October 5, 2009, and that the listing only required a high school diploma or equivalent. (Pl. Opp'n Decl. Ex. 16.) The attached exhibit is titled "Non Union Positions" and includes a "Staffing Manager" listing, requiring only a high school diploma or equivalent. (*Id.*) The summary only states that the duties are to provide "direct patient care," "related support" and "other related duties."

*Sec., L.L.C.*, --- F. App'x ---, --- 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v.*

*Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–

65, 2013 WL 3388446, at *4 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d

Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent.*

*Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence

on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The

"mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there

must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's

function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor

of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins.*

*Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that '[w]here an

employer acted with discriminatory intent, direct evidence of that intent will only rarely be

available, so affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, 526 F. App'x

121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir.

2010)).

      **b.**   **Title VII Discrimination Claim**

      Title VII prohibits an employer from discriminating "against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Thus,

"[a]n employment decision . . . violates Title VII when it is 'based in whole or in part on

discrimination.'" *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

Title VII discrimination claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981); *United States v. City of New York*, 717 F.3d 72, 83–84 (2d Cir. 2013) (discussing application of *McDonnell Douglas* framework to race discrimination claim); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (national origin claims are subject to burden shifting). Under the framework, Plaintiff must first establish a *prima facie* case of discrimination. *Hicks*, 509 U.S. at 506; *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491 (2d Cir. 2010). The plaintiff's burden at this stage is "minimal." *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506). If a plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509.) "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *City of New York*, 717 F.3d at 102. To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013)

("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### i.  Plaintiff's *Prima facie* Case

To establish a claim of racial or national original discrimination under Title VII, a plaintiff must show: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491–92.

Plaintiff self-identifies as African-American and Grenadian.  Thus, Plaintiff belongs to two protected classes, race and national origin, satisfying the first element.  *See Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *5 (E.D.N.Y. July 30, 2013) ("Plaintiff is African-American and is from Trinidad and Tobago, thus he is a member of two protected classes, race and national origin"); *Smith v. City of New York*, No. 12-CV-3250, 2013 WL 1903856, at *3 (S.D.N.Y. May 8, 2013) (plaintiff adequately pled "membership in a protected class based on national origin" as a "West Indian" of Jamaican descent); *Augustin v. Enlarged City Sch. Dist. of Newburgh*, 616 F. Supp. 2d 422, 439 (S.D.N.Y. 2009) ("There is no dispute that plaintiff, who is Haitian, belongs to a protected class."); *Robinson v. Keyspan*, No. 03-CV-4796, 2005 WL 3006687, at *4 (E.D.N.Y. Nov. 9, 2005) (plaintiff who was "black and of Guyanese national origin" was part of a protected class for both race and national origin); *Halstead v. N.Y.C. Transit Auth.*, No. 99-CV-03450, 2002 WL 34438897, at *67 (E.D.N.Y. Dec. 30, 2002) (West Indian plaintiff satisfied the national origin class), *aff'd*, 78 F. App'x 750

(2d Cir. 2003). Defendant does not dispute that Plaintiff was qualified for her job, satisfying the second element. However, Defendant argues that Plaintiff has failed to satisfy the final two elements of a *prima facie* case, because Plaintiff did not suffer an adverse employment action occurring under circumstances giving rise to an inference of discrimination.

### 1. Statute of Limitations

Plaintiff's discrimination claim is based on her limited access to Kronos which access was first denied in November 2007.[5] Normally, a charge of discrimination must be filed with the EEOC within 300 days of the alleged discriminatory act. *See* 42 U.S.C. §2000e-5(e)(1); *Lugo*, 518 F. App'x 28, 29 (2d Cir. May 1, 2013) ("For a Title VII action to be timely, a plaintiff must file the charge with the EEOC within 300 days of the allegedly unlawful employment practice."). Plaintiff filed her EEOC claim on August 19, 2009. (Pl. Opp'n Decl. Ex. 52.) Thus, Plaintiff's Title VII claims concerning events prior to October 23, 2008 would be barred pursuant to the 300-day statute of limitations. However, the Second Circuit has recognized the "continuing violation exception" which "'exists for claims that the discriminatory acts were part of a continuing policy and practice of prohibited discrimination' where 'one act of discrimination in furtherance of the ongoing policy occurred within the limitations period.'" *Lugo*, 518 F. App'x at 29 (quoting *Valtchev v. City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010) and *Patterson*

---

[5] At oral argument the Court dismissed Plaintiff's discrimination claim based on unlawful termination because Plaintiff failed to establish that her termination occurred under circumstances giving rise to an inference of discrimination. (Tr. 66:18–25.) Even assuming that Plaintiff had pled a *prima facie* case, Plaintiff failed to show that the Defendant's nondiscriminatory reason — Plaintiff running a su-su involving Rutland employees — was a pretext for discrimination. (*Id.* at 70:10–13.) The Court also dismissed any discrimination claim based on increased scrutiny in the form of error reports drafted by Kay. (*Id.* at 71:22–25.) Finally, the Court dismissed Plaintiff's hostile work environment claim for failure to show a hostile work environment or that any such environment was based on race or national origin animus. (*Id.* at 65:13–17.)

*v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)).

Defendant argues that the Kronos Training Incident, which occurred in November 2007, is time-barred. (Def. Reply Mem. 5–6.) However, Defendant ignores the fact that Plaintiff was not only denied full access during the Kronos Training Incident by Kay, but also, throughout Plaintiff's entire employment — including as staffing manager. (Pl. Opp'n Mem. 16.) According to Plaintiff, her inability to fully access Kronos forced her to request help from others, including lower level staffing clerks. (Pl. Opp'n Mem. 6; Pl. Opp'n Decl. Ex. 56.) Plaintiff's continued limited access to Kronos, from November 2007 to September 2009, serves as both the discriminatory action in question and the continued discriminatory practice. *Cf. Davis v. Bombardier Transp. Holdings (USA) Inc.*, No. 11-CV-0782, 2013 WL 6816605, at *6 (E.D.N.Y. Dec. 24, 2013) ("[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." (quoting *Schapiro v. N.Y.C. Dep't of Health*, 25 F. App'x 57, 60 (2d Cir. 2001)). Because Plaintiff's limited access to Kronos software was an ongoing occurrence, as opposed to "multiple incidents of discrimination," the Court will consider as timely the November 2007 Kronos Training Incident as well as Plaintiff's continued denial of full access to Kronos which, according to Plaintiff, continued until her suspension in August of 2009. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. ---, 131 S. Ct. 1325 (2011); *see also Rodriguez v. Cnty. of Nassau*, --- F. App'x ---, ---, 2013 WL 6570733, at *1 (2d Cir. Dec. 16, 2013) ("[I]f a plaintiff has experienced a continuous practice and policy of discrimination, the commencement

of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.").

However, even if the Court were to find that any of Defendant's actions related to Kronos before October 23, 2008 were time-barred, the Court would still recognize the pre-October 23, 2008 actions as background evidence concerning Plaintiff's limited access to Kronos post-October 23, 2008. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.").

## 2. Adverse Action

Plaintiff argues that her limited access to Kronos qualifies as an adverse employment action. (Pl. Opp'n Mem. 13–14.) The Second Circuit has made clear that "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (emphasis omitted). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold*, 366 F.3d at 152 (alteration, citation and internal quotation marks omitted). Plaintiff asserts that she suffered an adverse employment action when she was denied full access

to Kronos during the November 2007 Kronos Training Incident and continuously thereafter. Drawing all inferences in Plaintiff's favor, Plaintiff's limited Kronos access after her promotion to staffing manager was arguably an adverse employment action.

## A. Plaintiff's Initial Request for Access

With respect to the November 2007 training, Plaintiff's harm is akin to a "bruised ego," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (internal quotation marks omitted), or general unhappiness, *Sank v. City Univ. of N.Y.*, 219 F. Supp. 2d 497, 503 (S.D.N.Y. 2002) ("[N]ot everything that makes an employee unhappy is an actionable adverse action."). Although Plaintiff has shown that she was the only staffing clerk denied full access to Kronos in November 2007, she was also the only employee present without timekeeping responsibility, and as such, her limited access to Kronos during her tenure as a staffing clerk did not adversely impact the terms and conditions of her employment because she did not have access to the program previously nor would she need access to the program going forward. Although Plaintiff may have desired such access, and felt humiliated because she was denied access, such thwarted desire is not enough to constitute an adverse action. *See Moore v. Metro. Transp. Auth.*, No. 07-CV-3561, 2013 WL 4757527, at *13 (S.D.N.Y. Aug. 22, 2013) (denying a training request is not an adverse action without a showing of "material harm"); *Cooper v. Niagara Cmty. Action Program*, No. 08-CV-468S, 2010 WL 1407238, at *8 (W.D.N.Y. Mar. 31, 2010) ("Absent any evidence that Plaintiff was denied training related to the requirements of his position, or that his failure to attend a particular training had an adverse impact on his career or salary, he fails to establish a *prima facie* case relative to this claim."); *Hepburn v. City of Torrington*, No. 02-CV-1252, 2004 WL 1771590, at *5 (D. Conn. Aug. 4, 2004) ("[T]he denial of a lone training request cannot be considered to alter the terms and conditions of

employment.").  Moreover, while unable to access Kronos, Plaintiff was promoted, received a raise and never received a negative evaluation.  (Pl. Opp'n Decl. ¶ 8; Pl. Dep. 339:5–6); *cf. Ward v. Empire Vision Centers, Inc.*, 686 F. Supp. 2d 243, 249–50 (W.D.N.Y. 2010) ("[I]t is undisputed that the training [plaintiff] sought . . . was not related to the requirements of her position, would not have increased her salary or benefits, was not routinely offered to employees in her position . . . and was not a prerequisite for other, advanced positions . . . .  As such, [defendant]'s determination not to immediately grant [plaintiff]'s request for the training had no impact upon her employment . . . ."), *aff'd*, 421 F. App'x 127 (2d Cir. 2011).

### B.  Plaintiff's Subsequent Requests for Access

The analysis subsequent to Plaintiff's promotion is different.  As staffing manager, according to Plaintiff, her limited access to Kronos required her to request assistance from either Kay or lower-level staffing clerks.  (*See* Pl. Aff. 8 ("As Staff Manager, my duties required that I input payroll data within the Ansos computer program, which works alongside the Kronos program.  Whenever I needed access to the Kronos program, I was required to ask Ms. Christine Kay . . . for assistance or a non-managerial employee . . . .").)  Defendant argues that there was never a "need" for Plaintiff to access Kronos as Ansos automatically uploaded its data into Kronos, furthermore, limited access to Kronos was intentional because of security concerns.  (Liggins Decl. ¶ 8 ("ANSOS would automatically interface and transmit that schedule information over to the KRONOS timekeeping system."); *id.* ¶¶ 12–14 ("An individual with full access into the KRONOS system could add or delete work time for themselves or other employees, and thus manipulate payroll.").)  Defendant further argues that Plaintiff's job responsibilities did not include timekeeping or otherwise require full access to Kronos.  (*Id.* ¶¶ 23, 27.)  Indeed, the staffing manager position summaries submitted by Plaintiff seem to

confirm the lack of payroll responsibilities versus scheduling.  (*See* Pl. Opp'n Decl. Ex. 15

("Responsible for scheduling personnel time and movement within the Nursing Department[,]

[e]valuate[s] and finalizes time schedules and changes and analyzes needs for adequate

staffing[,] [a]dvises supervisors regarding employee absenteeism and lateness[ and] [k]eeps

record and submits report activities.") and Ex. 16 ("Provides direct patient care and related

support.  Performs other related duties.").)  In opposition, Plaintiff argues that "[l]ogically,

Plaintiff who assists with the attendance of staff employees required greater than a 'view-only'

access."  (Pl. Opp'n Mem. 16.)  Although most of the evidence appears to favor Defendant, the

Court recognizes that there is a genuine dispute as to whether Plaintiff, as staffing manager, did

indeed require full access to Kronos.  *See De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d

393, 412 (E.D.N.Y. 2013) ("MetLife's action in depriving the Plaintiff of access to the computer

system, which appears to have been needed to fully engage in his position, could easily fall into

the category of 'adverse employment action.'"), *aff'd*, --- F. App'x ---, 2014 WL 308005 (2d

Cir. Jan. 29, 2014).

     Defendant argues that Plaintiff's Kronos access cannot constitute an adverse action as she

never had full access to Kronos, therefore, there never was a materially adverse change.  (Def.

Supplemental Mem. 8.)  The Court declines to adopt such a narrow interpretation of the caselaw.

The Court recognizes that the Second Circuit has defined an "adverse employment action" as a

"materially adverse change," *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755

(2d Cir. 2004), and recently has emphasized the word "change."  *See Mills*, 519 F. App'x at 73

(finding that various incidents including a hug, intimidating behavior, shunning by colleagues

and refusal to accommodate scheduling requests do not constitute adverse actions as they did not

reflect "a materially adverse *change* in the terms and conditions of employment" (quoting

*Mathirampuzha*, 548 F.3d at 78)); *Mathirampuzha*, 548 F.3d at 78 ("An adverse employment action is "a materially adverse *change* in the terms and conditions of employment." (quoting *Sanders*, 361 F.3d at 755)). However, the Second Circuit also has recognized that the adverse action inquiry is fact-intensive and includes "other indices . . . unique to a particular situation." *Sanders*, 361 F.3d at 755; *see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'").

Here, Plaintiff was promoted into a position of authority which, according to her, required full access to Kronos as she often had to call Kay or lower-level employees to accomplish her job responsibilities. (Pl. Opp'n Mem. 6; Pl. Opp'n Decl. Ex. 56.) Although the typical adverse employment action may involve active malfeasance, Plaintiff has presented enough evidence to create a material dispute as to whether her continued lack of access to Kronos as staffing manager had a material adverse effect on her ability to effectively accomplish her responsibilities as staffing manager. *Cf. Potash v. Florida Union Free Sch. Dist.*, No. 10-CV-3299, 2013 WL 5273792, at *18 (S.D.N.Y. Sept. 18, 2013) (noting that there is no exhaustive list of what constitutes an adverse employment action and recognizing a "denial of training that may lead to promotional opportunities" as one example (quoting *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002))); *Stewart v. The City of New York*, No. 11-CV-6935, 2012 WL 2849779, at *8 (S.D.N.Y. 2012) ("denial of training can indeed be an adverse employment action, since officers with more training are more likely to be candidates for promotion"). Therefore, the Court finds that there is a genuine issue of disputed fact concerning the "tangible adverse effect[s] . . . on the terms and conditions of [Plaintiff's] employment," *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 87 (2d Cir. 2001), as a result of her

limited access to Kronos.  However, as discussed below, Plaintiff has not satisfied the final element of a *prima facie* discrimination case — she has not presented facts sufficient to draw an inference of discrimination.

### 3. Inference of Discrimination

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore*, 2013 WL 3968748, at *6 (citations omitted).  An inference of discrimination can be drawn from circumstances such as: "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)); *see also Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (finding that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." (quoting *Ruiz*, 609 F.3d at 493)); *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("A Title VII plaintiff may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case.  For example, a discriminatory race and/or color motive can be inferred if a plaintiff

was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African-American employees." (citing *Abdu-Brisson*, 239 F.3d at 468 and *Johnson v. Cnty. of Nassau*, 480 F. Supp. 2d 581, 597 (E.D.N.Y. 2007))).

However, a plaintiff's "mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim." *Moore*, 2013 WL 3968748, at \*6 (quoting *Gue v. Suleiman*, No. 10-CV-8958, 2012 WL 4473283, at \*8 (S.D.N.Y. Sept. 27, 2012)); *Karim-Seidou v. Hosp. of St. Raphael*, No. 09-CV-51, 2012 WL 6628886, at \*5 (D. Conn. Dec. 19, 2012) (the plaintiff's "own subjective beliefs" that he was discriminated against based on national origin and race were insufficient to survive summary judgment).

Plaintiff proffers the following as evidence of discrimination based on race and/or national origin: (1) Plaintiff was denied access to Kronos timekeeping software at an initial training and during her entire tenure at Rutland while Kay and lower-level employees were granted full access, (2) Rose told Plaintiff that she had limited Kronos access because she would "steal time," (3) Rose gave Plaintiff stationery instead of a monetary gift after Plaintiff's complaint regarding the Kronos Training Incident, (4) Rose told Moore that she would not approve Plaintiff for the staffing manager position, (5) the staffing manager position was changed to require an advanced degree, (6) Plaintiff was placed on probation when promoted to staffing manager, (7) Kay harassed Plaintiff through the creation and distribution of biweekly error reports, and (8) Defendant has a history of being sued for discrimination. (Pl. Opp'n Mem. 5–8, 16.)

As a preliminary matter, Plaintiff has not offered any evidence that any decisionmaker, or

anyone with influence over a decisionmaker, made any racially or ethnically charged comments.[6]

*See Finkelshteyn v. Staten Island University Hospital*, 687 F. Supp. 2d 66, 81 (E.D.N.Y. 2009) (noting that a plaintiff could raise an inference of discrimination by showing that discriminatory co-workers had considerable influence over a decision-maker and specific incidences of racial bias by the co-workers were in close temporal proximity to the decision-maker's adverse employment action); *Tucker v. New York City*, No. 05-CV-2804, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008) (holding that plaintiff offered no evidence that would permit reasonable jurors to find that his employer's actions were motivated by racial animus where, among other things, he did "not contend that anyone . . . treated him in a racially disparaging manner or showed any sign of racial bias or hostility"), *aff'd*, 376 F. App'x 100 (2d Cir. 2010).

## A. Similarly Situated

Liberally construing Plaintiff's opposition papers, Plaintiff argues that an inference of discrimination can be drawn from Defendant's disparate treatment of her as compared to other employees, specifically Kay, Director of Long Term Care, and the other employees present during the Kronos Training Incident. With respect to Kay, Plaintiff alleges that Defendant promoted Kay into positions for which she lacked experience and did not impose the same

_____

[6] At her deposition, Plaintiff testified that a now-deceased former employee told her that McKeon said, "just imagine a black person with no education they gave her a staffing manager position." (Pl. Dep. 277:10–24.) Defendant opposed Plaintiff's use of the statement on hearsay grounds. Plaintiff may not rely on inadmissible hearsay. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("It is appropriate for a district court ruling on summary judgment to consider only admissible evidence."); *Hayes v. Cablevision Sys. New York City Corp.*, No. 07-CV-2438, 2012 WL 1106850, at *11 (E.D.N.Y. Mar. 31, 2012) ("[A]llegations solely from plaintiff about what other employees perceived as Connor's motivations are inadmissible hearsay and cannot be considered on a motion for summary judgment." (citing Fed. R. Civ. Pro. 56(e))).

promotion-related burdens on Kay that Plaintiff endured, such as a six month probationary period after each promotion. (Pl. Opp'n Mem. 2–3.)

An inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Abdul-Hakeem*, 523 F. App'x at 20 (quoting *Ruiz*, 609 F.3d at 493); *see also Shlafer v. Wackenhut Corp.*, 837 F. Supp. 2d 20, 25 (D. Conn. 2011) ("Plaintiff must set forth factual circumstances from which discriminatory motivation may be inferred. Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals, or remarks conveying discriminatory animus." (citations omitted)); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 392 (S.D.N.Y. 2011) ("Allegations supporting motive may include preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus."). Such a showing "is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Ruiz*, 609 F.3d at 493 (internal quotation marks omitted). "The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' such that 'the comparator must be similarly situated to the plaintiff in all material respects.'" *Abdul-Hakeem*, 523 Fed. App'x at 21 (quoting *Ruiz*, 609 F.3d at 494); *see also Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) ("Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination 'by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [s]he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.'" (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997))).

"An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem*, 523 Fed. App'x at 21 (quoting *Ruiz*, 609 F.3d at 493–94 (internal quotation marks omitted)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000) ("We have said that to satisfy *Shumway*'s 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards. In addition, the standard we used in *Shumway* requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct." (citations omitted)). "Ordinarily, whether other employees are similarly situated is a factual issue that should be submitted to a jury, but '[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Sweeney v. Leone*, No. 05-CV-871, 2006 WL 2246372, at *13 (D. Conn. July 31, 2006) (quoting *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)); *see also Lugo*, 518 F. App'x at 30 (finding that the plaintiff produced no "information from which a reasonable jury could conclude that the officers referenced were similarly situated").

Plaintiff's attempt to compare herself to Kay fails because Kay and Plaintiff are not similarly situated. Plaintiff was the only staffing manager employed at Rutland at the time. (McKeon Decl. ¶ 19; Pl. Dep. 92:3–9.) Plaintiff alleges that Kay is now in charge of staffing — although she lacks Plaintiff's prior title — and Kay received promotions to unadvertised positions. (Pl. Opp'n Decl. ¶ 11–15, Ex. 12.) Although Plaintiff has gone to great pains to demonstrate the distinct treatment shown to Kay, there is no evidence that Kay and Plaintiff were subject to the same evaluation and discipline standards. Kay, unlike Plaintiff, did have

timekeeping responsibility for the nursing department at Rutland, requiring Kay to have full

access to Kronos.  (*See* Liggins Decl. ¶ 19.)  Because Plaintiff and Kay are not similarly situated,

any distinct treatment between the two cannot give rise to an inference of discriminatory intent.

*See Wingfield v. Rochester Sch. for the Deaf*, No. 13-CV-6321, 2013 WL 5475708, at *4

(W.D.N.Y. Sept. 30, 2013) ("Plaintiff and her ex-husband worked in different capacities . . . and

it is not plausible that they were similarly situated in all material respects, as is required for an

inference of discrimination based on disparate treatment."); *Bhanusali v. Orange Reg'l Med.*

*Ctr.*, No. 10-CV-6694, 2013 WL 4828657, at *6 n.12 (S.D.N.Y. Aug. 12, 2013) (characterizing

the comparison of doctors in different fields as "apples to oranges" for purposes of the similarly

situated inquiry); *Thomas v. City of New York*, No. 11-CV-5978, 2013 WL 3753557, at *8 n.9

(E.D.N.Y. July 12, 2013) (noting that different job descriptions prevented comparison).

      For much of the same reasons, Plaintiff's attempt to compare herself to Non-Grenadian

(but West Indian) African-American co-workers who participated in the Kronos Training

Incident also fails.  (*See* Pl. Opp'n Mem. 6.)  Defendant does not dispute that Plaintiff was the

only employee denied full access to Kronos during the Kronos Training Incident.  (*Id.* at 6.)

However, Plaintiff was also the only employee without timekeeping responsibility.  (*See* Liggins

Decl. ¶¶ 17–18.)  Furthermore, three of the individuals present during the Kronos Training

Incident did not work at Rutland as they were Kingsbrook Hospital employees.  (*Id.* ¶ 18.)

Jackie Edwards, the only other Rutland Employee, held the title of Payroll Manager which

necessitated her having full access to Kronos.  (*Id.* ¶ 17.)  Given the distinct workplace

responsibilities, and even work sites, between Plaintiff and the others trainees, those other

employees are not appropriate comparators.  *See Graham*, 230 F.3d at 40 ("What constitutes 'all

material respects' therefore varies somewhat from case to case and . . . must be judged based on

(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999))).

## B. Other Circumstantial Evidence of Discrimination

Plaintiff presents a variety of arguments and evidence which she believes betray Defendant's discriminatory animus.[7]  Plaintiff alleges that when she confronted Rose about her limited access to Kronos, Rose stated that Plaintiff was not given access because of concern that she was going to "steal time."  (Pl. Dep. 269:14–15.)  This statement does not explicitly speak to any racial or national origin animus, however, the Court recognizes that seemingly neutral language can be infused with discriminatory animus.  *See Lloyd v. Holder*, No. 11-CV-3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (recognizing "that certain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness").  Nevertheless, there is insufficient evidence in the record for a reasonable juror to determine that this comment was racially coded or that it was based on national origin animus.  *See Humphries v. City Univ. of New York*, No. 13-CV-2641, 2013 WL 6196561, at *9 (S.D.N.Y. Nov. 26, 2013) (requiring facts to support a subjective interpretation of facially neutral language); *Hayes v. Cablevision Sys. New York City Corp.*, No. 07-CV-2438, 2012 WL 1106850, at *9 (E.D.N.Y. Mar. 31, 2012) ("A facially neutral insult could constitute harassment motivated

---

[7]  At oral argument Plaintiff seemed to concede that her initial denial of full access to Kronos during the November 2007 training was not based on her race, given that almost all other attendees were of the same race.  However, the Court analyzes Plaintiff's claim liberally and assumes that she meant to speak consistently with her submissions to the Court which argue that she was denied full access based on her race and national origin.

by racial animus if uttered in an environment otherwise marked by abundant racial animosity or under circumstances that render it an expression of racial antipathy." (internal quotation marks omitted)).  Under the circumstances of this case, no reasonable juror could infer racial or national origin animus from the statement that Plaintiff was denied access to Kronos because of concern that she would "steal time" where access to the very system was given to at least four other African-Americans, three of whom were from Trinidad, and the record is devoid of any other facts suggesting a racially charged environment sufficient to support a subjective interpretation of facially neutral language.

Plaintiff also notes that after complaining about Kay's conduct to the human resources department, Plaintiff's relationship with Rose "drastically" changed.  (Pl. Opp'n Decl. ¶ 5.) Plaintiff points to two instances to demonstrate this drastic change: (1) in or around December 2007, instead of her usual monetary personal gift, Rose gave Plaintiff stationery, (Pl. Opp'n Mem. 12), and (2) around the same time, Rose allegedly told Moore that Rose would not promote Plaintiff into the staffing manager position, (Pl. Opp'n Decl. ¶ 6; Moore Decl. ¶ 11). These events may indeed suggest a change for the worse in Plaintiff's relationship with Rose, but, they do not give rise to any inference of discriminatory intent — that is, discrimination on the basis of race or national origin.  *cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) ("conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" (citation and internal quotation marks omitted); *Garzon v. Jofaz Transp., Inc.*, No. 11-CV-5599, 2013 WL 783088, at *3 (E.D.N.Y. Mar. 1, 2013) ("Evidence of differential treatment alone is insufficient to establish discrimination." (citing *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002))).  Moreover, any

discriminatory inference that could be taken from these events — however strained — is belied by Rose's subsequent approval of Plaintiff's promotion to staffing manager.

Plaintiff also asserts that the addition of a "duplicitous" bachelor's degree requirement to the staffing manager position, the six month probationary period she faced after her promotion to the staffing manager position, and the "scrutiniz[ing]" biweekly error reports by Kay throughout Plaintiff's tenure as staffing manager are all indicative of discriminatory animus. (*See* Pl. Opp'n Mem. 3, 12.) However, there is no evidence in the record before the Court to suggest that any of these actions were precipitated by, or committed with, discriminatory intent. Plaintiff was promoted to the staffing manager position although she did not have a bachelor's degree, (Pl. Dep. 97:11–15), the probationary period was required by Defendant for all promotions (Kingsbrook Employee Handbook 7, annexed to McKeon Decl. as Ex. 4), and Plaintiff does not allege that the bi-weekly error reports by Kay were inaccurate, or that Kay failed to report such errors for others outside of Plaintiff's race or national origin groups.

Finally, Plaintiff argues that Defendant has a history of discrimination as evidenced by prior complaints filed by women and people of color. (Pl. Opp'n Decl. ¶ 3, Ex. 1.) Plaintiff identifies five such complaints, the most recent of which was filed on October 23, 2006. (*Id.*) However, Plaintiff does not argue that these prior complaints are part of a larger discriminatory policy or mechanism or are in any way related to her denial of access to Kronos. *See Valtchev*, 400 F. App'x at 592 (affirming the lower court's finding that the plaintiff failed to establish an inference of discrimination through, *inter alia*, "affidavits from other teachers . . . that were prepared for a lawsuit in which plaintiff is not a party, alleging age discrimination at the school"); *Chudnovsky v. Prudential Sec., Inc.*, No. 98-CV-7753, 2000 WL 1576876, at *9 (S.D.N.Y. Oct. 23, 2000) ("Plaintiff's second allegation — that three age discrimination suits

were filed against the Broadway Branch . . . is not evidence of discriminatory animus."), *aff'd*, 51 F. App'x 901 (2d Cir. 2002). This evidence is insufficient to raise an inference of discrimination and is undermined by the record as a whole.

In sum, Plaintiff cannot show that Defendant limited Plaintiff's access to Kronos because of Plaintiff's race or national origin. Although Plaintiff may have felt a sincere sense of "embarrass[ment], humiliati[on], and discriminati[on]," (Pl. Opp'n Decl. ¶ 4), she has provided no admissible evidence that her limited access to Kronos was due to race or national origin. However, even assuming a *prima facie* case of discrimination, Plaintiff's claim fails at the third step of the *McDonnell Douglas* analysis.

### ii. Pretext

Even assuming that Plaintiff could establish a *prima facie* case, Plaintiff cannot meet her burden of establishing pretext as the record demonstrates that Defendant did not allow Plaintiff to fully access Kronos because Plaintiff did not have "timekeeping" responsibilities. Once a defendant has proffered a nondiscriminatory reason for its adverse action, the burden shifts back to the plaintiff to show that this reason is pretextual. *Holcomb*, 521 F.3d at 141 (2d Cir. 2008). To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial or national origin discrimination played a role in the adverse action taken by Defendant. *See id.* A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S. Ct. at 2526; *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013).

As discussed with respect to Plaintiff's *prima facie* case, there is little evidence that access to Kronos was necessary to Plaintiff's position and no evidence to suggest that it was necessary to Plaintiff's career mobility. Because Kronos allowed for the possible manipulation of payroll, access to Kronos was limited to those with timekeeping responsibility. (*See* Liggins Decl. ¶¶ 13–14.) Plaintiff had full access to Ansos, which automatically transmitted entered data into Kronos. (*Id.* ¶ 8.) It was then Kay's responsibility to review Kronos and if there were any scheduling discrepancies, Kay would contact Plaintiff or any other employee in charge of scheduling and responsible for the Ansos data that would have been imported into Kronos automatically. (*Id.* ¶¶ 28–29.) Plaintiff offers no evidence to contradict this account, and instead relies on the same evidence discussed in her *prima facie* case. However, "[t]he burden of establishing pretext is a higher burden than that required to establish the *prima facie* case . . . ." *Morales v. NYS Dep't of Labor*, 865 F. Supp. 2d 220, 246 (N.D.N.Y. 2012) (internal quotation marks omitted), *aff'd sub nom. Morales v. New York State Dep't of Labor, Div. of Employment Servs.*, 530 F. App'x 13 (2d Cir. 2013). Given this higher burden, the deficiencies in Plaintiff's *prima facie* case become all the more apparent. Plaintiff points to inapposite comparators, her changed relationship with Rose, increased scrutiny, and innocuous workplace requirements such as a probationary period and degree requirement. Plaintiff has failed to show that Defendant's non-discriminatory explanation for her limited access to Kronos was pretext for race or national origin discrimination. Most of Plaintiff's evidence bears little to no relationship to her limited access to Kronos and betrays no racial or national origin animus on the part of Defendant. Therefore, Plaintiff's discrimination claim is dismissed.

### c. Title VII Retaliation Claim

Plaintiff claims that almost immediately after her November 2007 complaint concerning the Kronos Training Incident, Defendant started to retaliate against her. (Pl. Opp'n Mem. 12.) According to Plaintiff, Defendant took the following adverse retaliatory actions: (1) giving Plaintiff stationery instead of a monetary gift in December 2007, (2) adding the bachelor's degree requirement to the staffing manager position, (3) increased and unnecessary scrutiny by Kay, (4) continued restricted access to Kronos, and (5) her ultimate suspension and termination. (*Id.* at 12–13.)

Claims of retaliation for engaging in protected conduct under Title VII are examined under the *McDonnell Douglas* burden shifting test. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in McDonnell Douglas . . . governs retaliation claims under . . . Title VII" (citing *McDonnell Douglas*, 411 U.S. at 802)). Under the test, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same). "If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, he would not have faced an adverse employment action." *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534 (emphasis added) (holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see*

*also Russo v. New York Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at *18 (E.D.N.Y. Sept. 23, 2013) (same); *Ellis v. Century 21 Dep't Stores*, --- F. Supp. 2d ---, ---, 2013 WL 5460651, at *27 (E.D.N.Y. Sept. 28,, 2013) (same); *Moore*, 2013 WL 3968748, at *14 (same).

### i. *Prima facie* Case

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *Summa*, 708 F.3d at 125; *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  The burden at the summary judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173 (citations omitted).  Defendant admits that Plaintiff's termination is an adverse employment action but disputes  that Plaintiff engaged in protected activity, that Defendant knew of any such protected activity, or that there is any connection between Plaintiff's termination and any alleged protected activity.  For the reasons set forth below, Plaintiff has failed to establish a *prima facie* case of retaliation.

### 1. Protected Activity

On November 2, 2007, Plaintiff notified the human resources department that she felt "discriminated against" based on the "act of segregation" which occurred at the November 2007

Kronos training. (Pl. Opp'n Decl. ¶ 5, Ex. 2.) On October 2, 2008, Plaintiff emailed McKeon, President of the human resources department, and specifically stated that she believed the November 2007 Kronos training and her continued restricted access to Kronos were violations of Title VII. (*See* Pl. Opp'n Decl. Ex. 24.)

Under Title VII, protected activity includes both "opposing discrimination proscribed by the statute and . . . participating in Title VII proceedings." *Jute*, 420 F.3d at 173; *see also Tepperwien*, 663 F.3d at 567 ("Title VII . . . prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." (citations omitted)). "It is not necessary that the conduct was actually prohibited by Title VII, but only that the plaintiff had a 'good faith belief' that such conduct was prohibited." *Ellis*, 2013 WL 5460651, at *28 (citing *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 212 (2d Cir. 2010); *see also La Grande*, 370 F. App'x at 212 ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))); *Kanhoye v. Altana Inc*., 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.' Title VII therefore prohibits an employer from retaliating against an employee for opposing the employer's potentially discriminatory practices." (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))). Lodging informal complaints with supervisors or even certain third parties, such as a customer, may constitute protected activity, *Cruz*, 202 F.3d at 566 (2d Cir. 2000), but the operative question is whether the individual had "good faith,

reasonable belief" that the employer actions she opposed "violated the law." *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (quoting *Manoharan*, 842 F.2d at 593). When making the complaint, a plaintiff must do so in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin." *Brummell v. Webster Central School Dist.*, No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009).

In Plaintiff's first complaint made to Liggins on November 5, 2007, she stated that she felt "discriminated against" based on an "act of segregation." This complaint does not constitute a protected activity because it falls short of showing a good faith belief that Plaintiff felt that she was the victim of unlawful discrimination prohibited by Title VII. Title VII buzzwords alone do not convert employee complaints into protected activity. *See Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010) ("[T]he mere fact that plaintiff used the term 'hostile environment' in her email to her supervisor is not enough . . . ."). Although Plaintiff elaborated, stating that, "[i]f my job title is the same as the other employees that were in the training, why then was I selected for exclusion from the entire training" and "[w]hy would a part time employee be granted the full training session and I as a full time employee be granted view access only?" (Pl. Opp'n Decl. ¶ 5, Ex. 2), these questions reflect a good faith belief that Plaintiff felt wronged but they do not adequately convey that Plaintiff felt discriminated against based on her race or national origin. *See Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir. 2013) (noting that absent explicit reference to sex or gender discrimination, plaintiff's complaint did not constitute protected activity). However, Plaintiff's second complaint, made to McKeon on October 2, 2008, sufficiently conveyed that Plaintiff had a good faith belief that Defendant was violating the law. This second complaint

expressly evoked Title VII, identified the November 2007 training and Plaintiff's continued

restricted access to Kronos as unlawful employment actions, and suggested that these actions

were due to Plaintiff's race and/or national origin.

## 2. Defendant's Knowledge

In order to satisfy the requirement of employer knowledge, the plaintiff must establish

that the employer understood, or could reasonably have understood, that the plaintiff's

opposition was directed at prohibited conduct. *See Rosioreanu*, 526 F. App'x at 120 (explaining

that "implicit in the requirement that the employer [was] aware of the protected activity is the

requirement that the [employer] understood, or could have reasonably understood," that the

plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by

Title VII" (alterations in original) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev't Corp.*,

136 F.3d 276 (2d Cir. 1998))).  It is not necessary that Plaintiff prove that the specific actors

knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge.

*See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even

if the agents who carried out the adverse action did not know about the plaintiff's protected

activity, the 'knowledge' requirement is met if the legal entity was on notice.  'Neither this nor

any other circuit has ever held that, to satisfy the knowledge requirement, anything more is

necessary than general corporate knowledge that the plaintiff has engaged in a protected

activity.'" (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000))); *Henry*,

616 F.3d at 147–8 (same); *Trivedi v. N.Y. Unified Court Sys. Office of Court Admin.*, 818 F.

Supp. 2d 712, 736 (S.D.N.Y. 2011) ("A plaintiff need not prove that the specific actors within an

organization were aware that the plaintiff made allegations of retaliation to make out a *prima*

*facie* retaliation claim; rather, 'general corporate knowledge that the plaintiff has engaged in a protected activity' is sufficient." (citations omitted)).

Plaintiff's first complaint was made to Liggins, then Director of the human resources department, and her second was made to McKeon, the President of the human resources department. The knowledge of the human resources department is sufficient to satisfy the third prong of a *prima facie* retaliation claim. *See Summa*, 708 F.3d at 125–26 ("And, at a minimum, the [defendant]'s legal office knew about the instant litigation. Nothing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity . . . ." (internal quotation marks omitted)).

### 3. Adverse Employment Action

To establish an adverse employment action for purposes of a retaliation claim, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Fincher*, 604 F.3d at 721. The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment, while the former "anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006)). In addition, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.*

Plaintiff argues that Rose's stationery gift instead of money as she received in the past, the addition of the bachelor's degree requirement to the staffing manager position, increased scrutiny by Kay, and continued denial of full access to Kronos were all adverse actions. These actions alone cannot be considered adverse employment actions. However, the Court recognizes that, in the aggregate, these actions, in combination with Plaintiff's limited Kronos access, arguably may be considered "substantial in gross" such that they amount to adverse employment action. Moreover, Plaintiff's suspension and termination undisputedly qualify as adverse actions. *See Sanchez v. Conn. Natural Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011) (listing third element of *prima facie* case of retaliation as "termination from employment or other adverse employment action"); *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (noting that "typical examples of actionable adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities'" (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))); *Feingold*, 366 F.3d at 156 ("[Plaintiff] suffered an adverse employment action when he was fired."); *Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012) ("termination clearly constitutes an adverse employment action").

### 4. Causal Connection

Plaintiff argues that the temporal proximity between the Defendant's discriminatory conduct and her complaints is sufficient to establish the requisite causal connection. (Pl. Opp'n Mem. 13.) For a retaliation claim to succeed, a plaintiff must show that the employer's adverse action was a direct or indirect result of her protected action. *See Diello v. Potter*, 413 F. App'x 344, 346 (2d Cir. 2011) (affirming the lower court's grant of summary judgment on plaintiff's

Title VII retaliation claim for Plaintiff's failure to offer any "evidence, direct or indirect" of a

causal connection between plaintiff's protected activity and the adverse employment action).

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or

retaliation claim by showing that the protected activity was closely followed in time by the

adverse employment action." *Gorzynski*, 596 F.3d at 110–11 (quoting *Gorman-Bakos v. Cornell*

*Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). The "but-for

causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie*

stage on summary judgment or at trial indirectly through temporal proximity." *Kwan*, 737 F.3d

at 845; *see also Kim v. Columbia Univ.*, 460 F. App'x. 23, 25 (2d Cir. 2012) ("[T]emporal

proximity between protected activity and adverse action may be sufficient to satisfy the causality

element of a *prima facie* retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement

that [plaintiff] show a causal connection between his complaints and his termination is satisfied

by the temporal proximity between the two."); *Dall v. St. Catherine of Siena Med. Ctr.*, --- F.

Supp. 2d ---, 2013 WL 4432354, at *22 (E.D.N.Y. Aug. 14, 2013) ("[A] plaintiff can indirectly

establish a causal connection to support a discrimination or retaliation claim by showing that the

protected activity was closely followed in time by the adverse employment action." (quoting

*Gorzynski,* 596 F.3d at 110–11)). There is no bright line rule concerning the temporal proximity

required to draw the causal inference. *See, e.g.*, *Gorzynski*, 596 F.3d at 110–11 ("Though [the

Second Circuit] has not drawn a bright line defining, for the purposes of a *prima facie* case, the

outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has]

previously held that five months is not too long to find the causal relationship."); *Smith v. Town*

*of Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 457 (E.D.N.Y.

2011) ("With regard to the establishment of a *prima facie* case through temporal proximity, the

Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place." (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("There is no bright-line beyond which a temporal relationship is too attenuated to prove causation." (citations omitted)).

All of the adverse actions identified by Plaintiff, other than Plaintiff's suspension and termination, occurred or began before any protected activity and, therefore, Plaintiff cannot rely on temporal proximity to support an inference of retaliation. *See Giudice v. Red Robin Int'l, Inc.*, --- F. App'x ---, ---, 2014 WL 552668, at *2 (2d Cir. Feb. 13, 2014) ("[W]here, as here, the only basis for showing causation at the *prima facie* stage is a temporal nexus, 'and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *McAllister v. Queens Borough Pub. Library*, 309 F. App'x 457, 459 (2d Cir. 2009) (finding that plaintiff failed to state a retaliation claim where his "termination . . . occurred before his protected activity"); *Fenner v. News Corp.*, No. 09-CV-09832, 2013 WL 6244156, at *26 (S.D.N.Y. Dec. 2, 2013) ("[M]ere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation." (alteration in original) (quoting *Washington v. City of New York*, No. 05-CV-8884, 2009 WL 1585947, at *8 (S.D.N.Y. June 5, 2009))); *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity.").  Plaintiff was suspended and then terminated almost two years after her initial complaint and ten months after her last complaint to the human resources

department.  The temporal connection is too attenuated in this instance to establish that her

termination was in retaliation for any protected activity.  *See Nicastro v. New York City Dep't of

Design & Const.*, 125 F. App'x 357, 358 (2d Cir. 2005) (suggesting that 10 months was not

sufficiently close to "demonstrate a causal nexus"); *see also DiBrino*, 118 F. App'x at 535 ("It

makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to

do so soon after the event." (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir.

2003))).  Plaintiff cannot rely on temporal proximity to prove the causal connection between her

protected activity and any alleged adverse action.  Because Plaintiff argues no other causal

connection between her complaints and her termination, Plaintiff fails to plead a *prima facie*

retaliation claim.

### ii.    Pretext

Even assuming that Plaintiff could establish a *prima facie* case of retaliation, Plaintiff's

claim would nevertheless fail because Plaintiff cannot show that but for her race and national

origin complaint, she would not have been terminated or subject to the other alleged adverse

actions.  "Title VII retaliation claims must be proved according to traditional principles of *but-

for* causation . . . .  This requires proof that the unlawful retaliation would not have occurred in

the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 570 U.S. at ---,

133 S. Ct. at 2533.  Therefore, the plaintiff must show that retaliation was a but for cause of the

adverse employment action.  *See Ellis*, 2013 WL 5460651, at *33 ("To avoid summary

judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a

preponderance of the evidence that but for the sexual harassment complaint, she would not have

been terminated."); *Russo*, --- F. Supp. at ---, 2013 WL 5346427, at *18 ("Title VII retaliation

claims must be proved according to traditional principles of *but-for* causation . . . ." (alteration in

original) (citation omitted)); *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013) ("[D]uring the final stage of the burden shifting frame-work, the plaintiff must show that retaliation was a but-for cause of the adverse employment action." (citation and internal quotation marks omitted)); *Dall*, 2013 WL 4432354, at *19 ("If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not have been terminated."); *Moore*, 2013 WL 3968748, at *14 (same); *Brooks*, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (stating that "but for" causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846.

Defendant claims that it terminated Plaintiff for running a su-su. (Def. Mem. 9–10.) Plaintiff has offered no evidence to refute this legitimate nonretaliatory reason nor has she presented any evidence from which any reasonable jury could find that but-for Plaintiff's complaint of discrimination, she would not have been terminated. Plaintiff has provided no evidence that her termination was motivated by retaliation rather than for her running a su-su. Plaintiff's retaliation claim is therefore dismissed.

### III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and dismisses Plaintiff's remaining Title VII discrimination and retaliation claims.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 25, 2014
       Brooklyn, New York